UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CCO CONDO PORTFOLIO (AZ) JUNIOR MEZZANINE, LLC,<br><br>　　　　　　Plaintiff,<br><br>　　-against-<br><br>HFZ CAPITAL GROUP, LLC and ZIEL FELDMAN,<br><br>　　　　　　Defendants. | Case No. 1:21-cv-02508-ER |

**DEFENDANTS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

　　　　　　　　　　　　　　　　　　　　**MORRISON COHEN LLP**

　　　　　　　　　　　　　　　　　　　　David E. Ross
　　　　　　　　　　　　　　　　　　　　909 Third Avenue
　　　　　　　　　　　　　　　　　　　　New York, New York 10022
　　　　　　　　　　　　　　　　　　　　(212) 735-8600
　　　　　　　　　　　　　　　　　　　　(212) 735-8708 (fax)

　　　　　　　　　　　　　　　　　　　　*Attorneys for Defendants*

**TABLE OF CONTENTS**

    **Page**

PRELIMINARY STATEMENT ................................................................................................ 1

PROPOSED FINDINGS OF FACT ......................................................................................... 6

    A.    The State Court Rules that the First Sale was Commercially Unreasonable ................................................................................................ 6

    B.    NOTWITHSTANDING THE STATE COURT ORDER, PLAINTIFF HASTILY DOUBLED-DOWN ITS BAD FAITH EFFORTS BY RUSHING, ONLY ONE DAY AFTER ITS FIRST SALE WAS COMMERCIALLY UNREASONABLE, A SECOND COMMERCIALLY UNREASONABLE SALE IN THE MIDST OF THE COVID-19 PANDEMIC AND THE DECEMBER AND NEW YEAR'S HOLIDAY SEASONS. UNSURPRISINGLY, PLAINTIFF WAS THE SOLE "CREDIT" BIDDER AND TOOK TITLE TO THE VALUABLE PROPERTIES ............... 7

PROPOSED CONCLUSIONS OF LAW ................................................................................. 8

  I.    PLAINTIFF'S SECOND SALE WAS NOT COMMERCIALLY REASONABLE ................................................................................................ 8

    A.    General Standard ............................................................................................ 8

        1.    Plaintiff's January 7th UCC Sale --- Conducted 21 Days After its December 17th Advertisement --- During a Pandemic and During the Peak of the Christmas and New Year's Holiday Period --- Was Not Commercially Reasonable ................................... 10

        2.    Separately and Distinctly, the Price Paid By Plaintiff, the Sole "Credit Bidder", who was also the Only Party to Attend the January 7th Auction, was Unreasonable and is a Separate Basis to Dismiss Plaintiff's Deficiency Claims ................................................ 11

PROPOSED LEGAL CONCLUSION ..................................................................................... 14

In accordance with the Rule 4(B)(ii) of the Court's Individual Practices, Defendants HFZ Capital Group LLC ("HFZ") and Ziel Feldman ("Mr. Feldman" and  together with HFZ, the "Defendants") respectfully submit their Proposed Findings of Fact and Conclusions in advance of the Bench Trial scheduled for September 19, 2023.

## PRELIMINARY STATEMENT

On December 9, 2020, Justice Barry Ostrager of the Supreme Court of the State of New York, County of New York (the "State Court") held that the means and methods of Plaintiff's attempted November 12th and November 17th UCC Sale of the Properties at issue in this matter were commercially unreasonable (the "State Court Order" at ECF Doc. No. 26, Exhibit PPPP). In that regard, the State Court Order held in relevant part:

> In the interests of brevity, the Court finds that the November 12 and November 17, 2020 UCC sales were commercially unreasonable because: (1) the defendant's marketing process created confusion in the marketplace concerning the interests that were for sale; (2) the defendant required the winning bidder to acquire the collateral in one package, instead of allowing bidders to bid on the four property interests held as collateral individually or as a package that could potentially maximize the value of the collateral; and (3) the defendant required bidders to post an unreasonably high deposit to qualify to bid. Thus, it was not surprising that the prior scheduled UCC sales attracted no bidders for the property interests in the on the four trophy Properties, thereby allowing the defendant to take control of the collateral by making a tax-efficient credit bid at the sale.

(ECF Doc. No.26, Ex. PPPP at pg. 2).

In the instant matter, history is repeating itself, to wit: the facts and the law make plain that Plaintiff's second rushed, improper attempt at a sale of the "four Trophy Properties", was also commercially unreasonable.

Indeed, as set forth below, *only (1) day after being hit with the State Court Order, Plaintiff threw caution to the wind by, using the same experts who got it into this mess, noticing a new sale on scant notice through the December holidays.* Even worse, after being admonished by the Court, Plaintiff --- which is wholly owned by a publicly traded company *did absolute no market research*

1

*and did not even do an appraisal.* Those are more than details and show that, rather than maximizing the value of these assets, it simply wanted the trophy Properties all for themselves. Such bad faith, inequitable and unlawful conduct should not be countenanced.

As such, the Court should dismiss Plaintiff's claims for a deficiency judgment along with any and all other ancillary relief. *See generally,* NY UCC Section 9-626(a)(3)

Notwithstanding the *actual facts*, as in its prior summary judgment submission, Plaintiff will likely argue that because they "followed" the directives of the State Court Order, that it necessarily follows that their second (rushed, fire sale) was commercially reasonable. <u>*Plaintiff is wrong*</u>.

To the contrary, the State Court Order was, among other things, conditional, to wit, "that any such future sale be conducted in a commercially reasonable manner in accordance with the terms of this [State Court] Order <u>*and the Uniform Commercial Code*</u>." *See* State Court Order, page 3 (italics added).

The last part is overlooked by Plaintiff but is crucial because it shows that the State Court was not limiting its scope to just the three areas it addressed, but that the totality of any future sale must comply with the UCC. Moreover, the State Court Order was not an order directing the precise terms of the sale, it simply advised Plaintiff, "in the interest of brevity" why certain of its terms were "commercially unreasonable."

The State Court also held that the prior terms of sale "chilled" bidding:

> Thus, it was not surprising that the prior scheduled UCC sales attracted no bidders for the property interests in the on the four trophy Properties, thereby allowing the defendant to take control of the collateral by making a tax-efficient credit bid at the sale.  (Id. at pg. 2).

Said differently, Plaintiff's facile argument --- that their second sale was commercially reasonable because it followed the State Court Order --- begs one very big question: <u>*if Plaintiff*</u>

2

*actually believed that the State Court Order held that the terms of its subsequent (fire sale) were commercially reasonable, why didn't they bring this action in that State Court before the very same judge?* The painful answer? Because Plaintiff knew that Justice Ostrager would again rule that the terms of its subsequent, rushed sale of these "trophy Properties" were not commercially reasonable. This Court's conclusion should be no different. This is for the following reasons.

*First*, while Plaintiff "touts" the *bona fides of* its "expert" Newmark on setting the terms of the January 7th Sale, it conveniently omits that Newmark *is the same expert* that led the State Court to adjudicate the prior sales as being commercially unreasonable.

*Second*, given the complexity and size of this transaction --- which the State Court held were four "trophy Properties" --- and after an adjudication that Plaintiff (and its experts) attempted to hold a commercially unreasonable sale and "scoop up" the property on the cheap, one would think that Plaintiff would take a couple of days to ingest same and "regroup." But wanting these trophy Properties for itself, Plaintiff, again, inexplicably threw caution to the wind.

Specifically, while the State Court Order was electronically issued on December 9, 2020 at 12:51 p.m., Plaintiff (and its purported "experts") "doubled-down" on their bad faith efforts by hastily issuing a second notice of sale with (unreasonable) Terms *the very next day*. Apparently, Plaintiff did not care that its hasty issuance was: (i) in the midst of a global pandemic; (ii) in the midst of the smoldering flames of its first attempted commercially unreasonable sale; (iii) *noticed the second sale for January 7, 2021, which was not just on short notice, during a pandemic: but also during the heart of the December and New Year's holiday season*; and (iv) otherwise identified commercial unreasonable Terms of Sale, including Section 12 thereof, to chill bidding. *See,* ECF Doc No. 26, Exhibit A to Exhibit IIII.

*actually believed that the State Court Order held that the terms of its subsequent (fire sale) were commercially reasonable, why didn't they bring this action in that State Court before the very same judge?* The painful answer? Because Plaintiff knew that Justice Ostrager would again rule that the terms of its subsequent, rushed sale of these "trophy Properties" were not commercially reasonable. This Court's conclusion should be no different. This is for the following reasons.

*First*, while Plaintiff "touts" the *bona fides of* its "expert" Newmark on setting the terms of the January 7th Sale, it conveniently omits that Newmark *is the same expert* that led the State Court to adjudicate the prior sales as being commercially unreasonable.

*Second*, given the complexity and size of this transaction --- which the State Court held were four "trophy Properties" --- and after an adjudication that Plaintiff (and its experts) attempted to hold a commercially unreasonable sale and "scoop up" the property on the cheap, one would think that Plaintiff would take a couple of days to ingest same and "regroup." But wanting these trophy Properties for itself, Plaintiff, again, inexplicably threw caution to the wind.

Specifically, while the State Court Order was electronically issued on December 9, 2020 at 12:51 p.m., Plaintiff (and its purported "experts") "doubled-down" on their bad faith efforts by hastily issuing a second notice of sale with (unreasonable) Terms *the very next day*. Apparently, Plaintiff did not care that its hasty issuance was: (i) in the midst of a global pandemic; (ii) in the midst of the smoldering flames of its first attempted commercially unreasonable sale; (iii) *noticed the second sale for January 7, 2021, which was not just on short notice, during a pandemic: but also during the heart of the December and New Year's holiday season*; and (iv) otherwise identified commercial unreasonable Terms of Sale, including Section 12 thereof, to chill bidding. *See,* ECF Doc No. 26, Exhibit A to Exhibit IIII.

Additionally, while Plaintiff produced hundreds of thousands of pages of discovery in this matter, <u>*they failed to produce a single documents showing, among other things that they even attempted to analyze the real estate- market and the value of the trophy Properties*</u>. Heck, Plaintiff did not even bother doing an appraisal.

These omissions are striking considering that Plaintiff is wholly owned by CIM Real Estate Finance Trust, a publicly traded company.  It is equally striking that they would fail to *take their time (or at least more than 24 hours) and do this "right"* after they and their experts were admonished by a State Court Judge for their prior commercially unreasonable efforts.

Almost as bad, in Exhibit NNNN and paragraph 179 of Plaintiff's Gibbons Aff., he admits that Plaintiff <u>*did not formally advertise the sale until December 17th*</u>, which was only 8 days before Christmas and 21 days from the second UCC sale of four valuable properties. *See,* ECF Doc. No. 26. And other than that advertising and a purported "reminder" e-mail sent on December 29th (2 days before New Year's eve) Plaintiff did nothing and was able to procure these Properties for a mere $65 million credit bid.

And, while the State Court Order did not order a 60-90 day moratorium on the second sale, *it did not hold that rushing a sale on 21 days-notice* --- which included the heart of the holiday season --- was "commercially reasonable."  Moreover, in addition to the above, paragraph 12 of the Term also gave Plaintiff the unilateral right to "leap frog" any bidder and drive them away from being interested.  *See,* ECF Doc No. 26, Gibbons Aff., Exhibit A to Exhibit IIII.

Additionally, while the State Court Order instructed Plaintiff to lower the Required Deposit to "a reasonable deposit requirement", Plaintiff only lowered it from $1,000,000 to $500,000; and lowered the Second Deposit from $9,000,000 to 5% of the accepted bids. *See respectively*, ECF Doc. No. 26, Exhibit A to Exhibit IIII, sections 5, 9. Both are not only large numbers that were

4

provided on short notice, but leave a question of fact as to whether they were --- as required by the State Court Order ---- "*a reasonable deposit requirement*." See State Court Order, pg. 2.

Indeed, most telling is what Plaintiff's Gibbons Aff. admits by omission: that other than the "credit bidding" Plaintiff, there <u>were no other bidders</u>. And because of the Required Deposit and other due diligence which was required to be provided by January 5th: Plaintiff knew it but conducted the second sale anyway. <u>*This was by design*</u>. And like its first commercially unreasonable sale, Plaintiff --- as Justice Ostrager warned --- "attracted no bidders" because it rushed--- through the same experts --- a second, commercially unreasonable sale.

Plaintiff's second commercially unreasonable notice all but guaranteed that Plaintiff would be the "sole bidder" (*which it was*).

Said differently, Plaintiff's orchestration of a sham foreclosure sale, on short notice, with chilling terms, during the height of the pandemic/holiday season, all but ensured that it would be the only bidder and cannot be considered "commercially reasonable" under any rational interpretation of that term. This is especially so considering that the "prime objective" of a UCC foreclosure sale is to optimize the collateral's resale price and "that a qualifying disposition of collateral must be made in [a] good faith attempt to dispose of the collateral to the parties' <u>*mutual advantage*</u>." See generally *European Am. Bank v. Sackman Mortg. Corp. (In re Sackman Mortg. Corp.)*, 158 B.R. 926, 936 (Bankr. S.D.N.Y. 1993) (italics added).

The sole issue to be decided at trial is articulated in the Court's decision on summary judgment (the "Decision", ECF 34): "*whether the sale of collateral leading to the calculation of this amount owed is commercially reasonable*."

Given the totality of the undisputed facts and well-settled law, the Court can only come to one conclusion: Plaintiff's rushed, second "holiday fire sale" on January 7, 2021 UCC foreclosure

sale was not commercially reasonable. This conclusion is also legally supported by Comment 3 to NY UCC 9-610 which states that "[i]t may, for example be prudent not to dispose of goods when the market has collapsed." (Italics added).

As a result of Plaintiff's inequitable conduct, this Court should deny Plaintiff any and all damages resulting from the alleged "deficiency judgment" and also deny Plaintiff's request for fees and costs in their entirety.

## PROPOSED FINDINGS OF FACT

**A.   THE STATE COURT RULES THAT THE FIRST SALE WAS COMMERCIALLY UNREASONABLE**

As noted above, Plaintiff is using the same "experts" (Newmark) to support its second commercially unreasonable sale even though, on December 9, 2020, those same experts were adjudicated to have attempted a commercially unreasonable sale of the Properties. In that regard, the State Court Order held in relevant part:

> In the interests of brevity, the Court finds that the November 12 and November 17, 2020 UCC sales *were commercially unreasonable* because: (1) the defendant's marketing process created confusion in the marketplace concerning the interests that were for sale; (2) the defendant required the winning bidder to acquire the collateral in one package, instead of allowing bidders to bid on the four property interests held as collateral individually or as a package that could potentially maximize the value of the collateral; and (3) the defendant required bidders to post an unreasonably high deposit to qualify to bid. *Thus, it was not surprising that the prior scheduled UCC sales attracted no bidders for the property interests in the on the four trophy Properties, thereby allowing the defendant to take control of the collateral by making a tax-efficient credit bid at the sale.*

(ECF Doc. No. 26, Ex. PPPP at pg. 2).

The State Court also held "that any such future sale be conducted in a commercially reasonable manner in accordance with the terms of this [State Court] Order and the [UCC]" and that the second terms of sale contain a "reasonable deposit requirement." *Id*. at pgs. 2-3.

B.     **NOTWITHSTANDING THE STATE COURT ORDER, PLAINTIFF HASTILY DOUBLED-DOWN ITS BAD FAITH EFFORTS BY RUSHING, ONLY ONE DAY AFTER ITS FIRST SALE WAS COMMERCIALLY UNREASONABLE, A SECOND COMMERCIALLY UNREASONABLE SALE IN THE MIDST OF THE COVID-19 PANDEMIC AND THE DECEMBER AND NEW YEAR'S HOLIDAY SEASONS. UNSURPRISINGLY, PLAINTIFF WAS THE SOLE "CREDIT" BIDDER AND TOOK TITLE TO THE VALUABLE PROPERTIES**

The following facts are undisputed and show that Plaintiff's second sale, including its hastily issued "Terms" were commercially unreasonable:

- On December 9, 2020 at 12:51 p.m., the State Court ruled that Plaintiff had attempted to improperly sell the four trophy Properties via a commercially unreasonable sale (ECF Doc. No. 26, Ex. PPPP);

- Instead of taking time to digest the State Court Order's admonishment of its tactics, the very next day --- December 10th --- Plaintiff hastily issued a second notice with Terms of sale to Plaintiff scheduling the sale to take place on January 7, 2021 (ECF Doc No. 26, Gibbons Aff., Ex. IIII);

- For the first time, a week later --- December 17th, Plaintiff formally advertised the sale, *which was 8 days before the Christmas holiday and only 21 days from the January 7th sale date* (*Id.* at paragraph 179, Ex. NNNN;
- that said 21 days spanned not just the global pandemic, but also the December and New Year's holiday;

- That Plaintiff required bidders to provide an (excessive) opening deposit of $500,000 and an excessive second deposit of 5% of the full purchase price, both of which were high and commercially unreasonable. Indeed, Justice Ostrager only ruled that the initial $1,000,000 and $9,000,000 deposits were unreasonable and thus, it remains a question of fact as to whether these deposits were reasonable (ECF Doc. No. 26, Gibbons Aff., Exhibit A to Exhibit IIII, Sections 5, 9);

- Section 12 of the Terms of Sale gave Plaintiff the right to "leap frog" a winning bidder, thereby chilling the market (*Id.*);

- Plaintiff concedes that, prior to holding the sale, Plaintiff knew that no one had submitted any (bloated) deposit amount *and that it sale terms had attracted absolutely no bidders*;

- *Section 10(e)(ii) of the Pledge requires compliance with New York law, which includes commercial reasonableness under the UCC*; and

7

- Based upon its short notice and the unprecedented pandemic, Plaintiff's crafty plan worked: it was able to depress the market, credit bid its debt and obtain control of the four trophy Properties for an absurdly low price.

While the above facts were known pre-discovery, the discovery produced in this case also leads to the indisputable conclusion that the second sale was commercially unreasonable. For example, while Plaintiff produced hundreds of thousands of pages of discovery in this matter, they failed to produce a single document showing they even attempted to analyze the real estate market or value the trophy Properties. Indeed, it is undisputed that Plaintiff did not even bother doing any appraisals.

These omissions are striking considering that Plaintiff is wholly owned by CIM Real Estate Finance Trust, a publicly traded company. It is equally striking that, given these facts, Plaintiff would fail to take their time and do this "right" after they and their experts were admonished by a State Court Judge for their prior commercially unreasonable efforts.

## PROPOSED CONCLUSIONS OF LAW

**I.    PLAINTIFF'S SECOND SALE WAS NOT COMMERCIALLY REASONABLE**

    **A.    General Standard**

It is axiomatic that New York law requires that the creditor bear the burden of establishing that it is conducting a UCC sale in a commercially reasonable manner. *See e.g.*, *GE Credit Corp. v. Durante Bros. & Sons, Inc.*, 79 A.D.2d 509, 510 (1st Dep't 1980); *Sec. Trust Co. of Rochester v. Thomas*, 59 A.D.2d 242, 247 (4th Dep't 1977); *Central Budget Corp. v. Garrett*, 48 A.D.2d 825, 826 (2d Dep't 1975).

"The term 'commercially reasonable' is not specifically defined by the N.Y. UCC and has been held to mean 'that a qualifying disposition must be made in the good faith attempt to dispose of the collateral to the parties' <u>mutual best advantage</u>.'" *In re Sackman Mortg. Corp.*, 158 B.R. at

936; *108th St. Owners Corp. v. Overseas Commodities Ltd.*, 238 A.D.2d 324, 325 (2d Dep't 1997); *MTI Sys. Corp. v. Hatziemanuel*, 151 A.D.2d 649 (2d Dep't 1989). New York courts have repeatedly recognized that whether the terms of a UCC sale were commercially reasonable cannot be resolved prior to discovery. This is because "[w]hether a particular procedure is commercially reasonable is a question of fact." *First Bank & Tr. Co. v. Mitchell*, 123 Misc. 2d 386, 394 (Sup. Ct. Tompkins Cty. 1984).

"Whether a sale was commercially unreasonable is, like other questions about 'reasonableness', <u>*a fact-intensive inquiry*</u>; no magic set of procedures will immunize a sale from scrutiny." *In re Excello Press, Inc.*, 890 F.2d at 905 (applying N.Y. law) (italics added); *see also Fed. Deposit Ins. Corp. v. Forte*, 144 A.D.2d 627, 629 (2d Dep't 1988); *Primavera*, 130 F. Supp. 2d at 545.

The UCC requires that "[e]very aspect of a disposition of collateral, including the method, manner, time, place, and other terms, must be commercially reasonable." N.Y. U.C.C. § 9-610(b). Pursuant to UCC § 9-627(b), the sale of collateral after a default is commercially reasonable if made "(1) in the usual manner on any recognized market; (2) at the price current in any recognized market at the time of the disposition; or (3) otherwise in conformity with reasonable commercial practices among dealers in the type of property that was the subject of the disposition."

Any sale must follow commercially reasonable procedures. The purpose is to "insure that… the property is not sacrificed at a price below its actual value." *See Sumner v. Extebank*, 88 A.D.2d 887, 888 (1st Dep't 1982). Commercial reasonableness requires a secured lender to employ the methods and procedures that will fulfill the UCC's prime objective of "optimizing resale price" at the sale. *See In re Sackman Mortg. Corp.*, 158 B.R. at 936.

9

Here, in light of the totality of circumstances, it is clear that Plaintiff has failed to meet its burden that the sale at issue was commercially reasonable.

> 1. **Plaintiff's January 7th UCC Sale --- Conducted 21 Days After its December 17th Advertisement --- During a Pandemic and During the Peak of the Christmas and New Year's Holiday Period --- Was Not Commercially Reasonable**

As set forth above, under the UCC, "[e]very aspect of disposition of collateral, including the method, manner, time, place, and other terms, must be commercially reasonable." (N.Y. U.C.C. § 9-504). The UCC requires that not even one aspect of the Sale be commercially unreasonable. Here, the second sale fails in every way. Plaintiff's arguments regarding the substantive merits of its sale are both wrong and both inappropriate at the pre-discovery stage. This is so for the following reasons:

(1) On December 9, 2020 at 12:51 p.m., the State Court ruled that Plaintiff had attempted to improperly sell the four trophy Properties via a commercially unreasonable sale;

(2) Instead of digesting the State Court Order's admonishment of its tactics, the very next day --- December 10th --- Plaintiff hastily issued a second notice of sale and Terms;

(3) A week later --- December 17th, Plaintiff formally advertised the sale, _which was 8 days before the Christmas holiday and only 21 days from the January 7th sale date_;

(4) that said 21 days spanned not just the global pandemic, but also the December and New Year's holiday;

(5) That Plaintiff required bidders to provide an (excessive) opening deposit of $500,000 and an excessive second deposit of 5% of the full purchase price, both of which were high and commercially unreasonable. Indeed, Justice Ostrager only ruled that the initial $1,000,000 and $9,000,000 deposits were unreasonable and thus, it remains a question of fact as to whether these deposits were reasonable;

(6) Section 12 of the Terms of Sale gave Plaintiff the right to "leap frog" a winning bidder, thereby chilling the market;

(7) that, prior to holding the sale, Plaintiff knew that no one had submitted either (bloated) deposit amount _and that it sale terms had attracted absolutely no bidders_; and;

(8) That based upon its short notice and the unprecedented pandemic, Plaintiff's crafty plan worked: it was able to depress the market, credit bid its debt and obtain control of the four trophy Properties for an absurdly low price.

10

The Pledge also does not "save" Plaintiff because --- among other things --- 10(e)(ii) thereof unequivocally states that any such foreclosure sale "*be conducted in accordance with the laws of the State of New York*." This necessarily includes compliance with the UCC.

Each of these factors demonstrate that the second sale was not commercially unreasonable. At bottom, these Terms and its timing were unreasonable in a normal market, let alone in a pandemic.

Moreover, while there were no pre-trial depositions in this case, Defendants are confident that it will elicit additional facts during cross-examination of Plaintiff's sole witness that the second sale was commercially unreasonable.

As such, Defendant's orchestration of a UCC foreclosure sale under such Terms, where it was the only bidder --- and which it knew it would be the only bidder --- makes plain that there is a question of fact as to whether it was commercially reasonable under New York law. Indeed, the New York Court of Appeals has recognized that the "prime objective" of a UCC foreclosure sale is to optimize the collateral's resale price, yet here, Plaintiff has done the opposite and all but guaranteed that no one else would bid at its January 7th "holiday fire sale."

> **2.    Separately and Distinctly, the Price Paid By Plaintiff, the Sole "Credit Bidder", who was also the Only Party to Attend the January 7th Auction, was Unreasonable and is a Separate Basis to Dismiss Plaintiff's Deficiency Claims**

For dispositions to the secured creditor or parties related to the secured creditor, the UCC sets out a special rule: the deficiency is reduced in any case in which the debtor can show "amount of the proceeds of the disposition is significantly below the range of proceeds that a complying disposition...would have brought."

In that regard, UCC Section 9-615(f) provides:

> The surplus or deficiency following a disposition is calculated based on the amount of proceeds that would have been realized in a disposition complying with this part to a transferee other than the secured party, a person related to the secured party, or a secondary obligor if:
> (1) the transferee in the disposition is the secured party, a person related to the secured party, or a secondary obligor; and
> (2) the amount of proceeds of the disposition is significantly below the range of proceeds that a complying disposition to a person other than the secured party, a person related to the secured party, or a secondary obligor would have brought.

In cases in which the secured party is the purchaser via a credit bid, the UCC assumes that all other parts of the sale were effective --- *of course, they were not here* --- and focuses solely on the sale price as a standalone aspect of commercial reasonableness. 4 White, Summers, & Hillman, *Uniform Commercial Code* § 34:25 (6th ed.) ("Unlike the usual deficiency case, here [i.e., a credit bidder obtains the collateral] it is enough that the debtor proves a low price; the debtor need not go through the normal ritual of attacking notice and the various aspects of the sale.").

Thus, UCC Section 9-615(f) codifies the common-sense proposition that when the secured party is the purchaser, "the secured party sometimes lacks the incentive to maximize the proceeds of disposition." Comment 6 to N.Y. U.C.C. 9-615. Consequently, although a disposition may comply with the procedural requirements of Article 9, the sale price may be artificially low, especially when the secured party purchases the collateral via a credit bid. *Id.*; *see also* Donald J. Rapson, *Deficient Treatment of Deficiency Claims: Gilmore Would Have Repented*, 75 Wash. U. L.Q. 491, 493 (1997) (recognizing the "sometimes abusive practice that occurs in the enforcement of deficiency claims -- particularly in the circumstance where the secured party, or one with whom it has a relationship, has 'brought in' the collateral at the foreclosure sale [i.e., entered a credit bid]"); Luize E. Zubrow, *Rethinking Article 9 Remedies: Economic and Fiduciary Perspectives*, 42 UCLA L. Rev. 445, 525 (1994) (recognizing that pre-UCC 9-615(f), the foreclosing creditor

could use a two-step process to increase its return: "After submitting a low but winning credit bid for the collateral, the creditor can sue for a deficiency. The deficiency judgment recovery will not be adjusted downward to take into account profits made by the foreclosing creditor on the resale of the collateral.").

Indeed, when there is no competitive bidding at a foreclosure sale --- as was the case here --- and when the secured party enters a credit bid (as also happened here), "[t]he 'bid' price ... often has no relation to the value of the collateral and there is no reason or incentive for it to reflect that value." Rapson, 75 Wash. U. L.Q. at 543. Section 9-615(f) accordingly adjusts for this lack of incentive. *See,* Comment 6 to N.Y. U.C.C. 9-615. In short, when the secured creditor purchases the collateral, the price is subject to careful scrutiny. Toward that end, a direct inquiry into the value of the collateral through "expert testimony, appraisals, price guidebooks, and other secondary source evidence of value and fair price" is therefore appropriate. *See* Michael Korybu, *Searching for Commercial Reasonableness Under the Revised Article 9*, 87 Iowa L. Rev. 1383, 1434 (2002).

Finally, as set forth at length above, with no other bidders in a short-noticed sale that occurred during a pandemic and the December/New Year's holidays, it Plaintiff entered a credit bid that was dramatically lower than the actual value of the Properties.  As a result, the starting point for the deficiency that Plaintiff seeks is not the amount of the credit bid but instead what a disinterested third-party would have paid in a market transaction. Plaintiff's conduct here was designed to depress the value of the collateral and to drive up the deficiency amount that they could seek from Defendants.

Moreover, given the economic environment at the time of the second sale, the UCC foreclosure sale at issue should have awaited an upturn in the market.  *See,* Comment 3 to Section

13

9-610 s ("[i] may, for example, *be prudent not to dispose of goods when the market has collapsed."*). (Italics added).

This is especially crucial in this case where, among other things:

- Plaintiff completely failed to do any due diligence at all concerning the market;
- Plaintiff rushed the sale after being admonished by Justice Ostrager for attempting a commercially unreasonable sale;
- Plaintiff failed to even do an appraisal of the Property; and
- Its "experts" previously led them down the "abyss" before Justice Ostrager.

## **PROPOSED LEGAL CONCLUSION**

A secured creditor's failure to follow all of the sale requirements of Article 9 affect the ability to recover on a deficiency claim. For example, Section 9-626(a)(3) of the UCC, a secured creditor who fails to comply with the requirements of Article 9 faces a rebuttable presumption that the amount of proceeds that should have been produced by the sale is equal to the secured obligation plus costs. Furthermore, Section 9-626(a)(3) of the UCC requires that a secured creditor's deficiency be calculated using the amount of the rebuttable presumption, leaving the secured creditor without a deficiency claim.

Here, Plaintiff's second sale falls woefully short of being commercially reasonable. As such, its claims against the Defendants for a deficiency judgment and other relief must be dismissed.

Dated: New York, New York
      September 6, 2023

                                  MORRISON COHEN LLP

                                  By:    */s/ David E. Ross*
                                           David E. Ross
                                           Y. David Scharf
                                           Jay R. Speyer
                                           909 Third Avenue
                                           New York, New York 10022
                                           Phone: 212-735-8600
                                           Fax:   212-735-8708

                                *Attorneys for Defendants*