UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

CCO CONDO PORTFOLIO (AZ)
JUNIOR MEZZANINE, LLC,

                Plaintiff,

– against –

ZIEL FELDMAN and HFZ CAPITAL
GROUP LLC,

                Defendants.

**OPINION & ORDER**

21 Civ. 2508 (ER)

---

RAMOS, D.J.:

    CCO Condo Portfolio (AZ) Junior Mezzanine, LLC, brought this action to enforce four sets of loan guaranties related to four New York City properties. Defendants Ziel Feldman and HFZ Capital Group LLC served as guarantors for the loans. The Court granted summary judgment for CCO Condo as to Defendants' liability for failing to meet their obligations as guarantors to repay the loans. With respect to damages, however, the Court found that there were material issues of fact as to whether the sale of the properties was commercially reasonable. The Court then held a one-day bench trial to address that question. For the reasons set forth below, the Court concludes that the sale was commercially reasonable and directs that judgment be entered in favor of CCO Condo.

I.    BACKGROUND

    A.  Factual Background

    In November 2018, CCO Condo's predecessor, CCO Condo Portfolio (NY) Mezzanine, LLC (CCO NY), made four junior mezzanine loans related to four Manhattan condominium projects owned by Defendants' affiliates. *CCO Condo Portfolio (AZ) Junior Mezzanine, LLC v. Feldman*, No. 21 Civ. 2508 (ER), 2022 WL 3867910, at *1 (S.D.N.Y. Aug. 30, 2022). Defendants guaranteed payment of principal and interest on the loans. *Id.* All four borrowers defaulted in November 2019. *Id.* In July 2020, CCO NY sent Defendants notices of default and notices of demand for the amounts due. *Id.*;

*see* Doc. 31 ¶ 3. CCO NY assigned its interest in the loans to CCO Condo in September 2020. *CCO Condo*, 2022 WL 3867910, at *1.

CCO Condo announced that a Uniform Commercial Code (UCC) foreclosure sale would take place on November 12, 2020. Pl.'s Trial Ex. 1 (Direct Testimony Affidavit of Daniel Ottensoser) ¶ 11. CCO Condo engaged Newmark & Company Real Estate, Inc., an advisory firm with UCC expertise, to help manage the sale. *Id.* ¶ 7. At Newmark's recommendation, CCO Condo also engaged Mannion Auctions, LLC, an experienced UCC auction house. *Id.* Throughout the process, Newmark maintained a digital data room of documents related to the loans that was accessible to potential bidders upon request. *Id.* ¶ 9.

On November 11, one day before the scheduled sale, HFZ Capital sued CCO Condo in New York state court. Doc. 46, Agreed Statements of Fact (ASOF) ¶ 8. HFZ Capital alleged that CCO Condo was conducting a "rushed, commercially unreasonable sale." *Id.* ¶ 10. The state court entered a temporary restraining order (TRO), and the sale was not held as scheduled on November 12. *Id.* ¶¶ 12–13.

On November 16, CIM Group—the "ultimate manager" of CCO Condo, *id.* ¶ 18—noticed the sale to be held on November 17. Tr. 57:19–58:9. That sale was also halted, as the state court extended the TRO pending an evidentiary hearing. ASOF ¶ 14; *see also* Tr. 63:9–16. The hearing took place on November 30, and the state court issued its decision on December 9. ASOF ¶¶ 15–16. It found that the planned sales were commercially unreasonable. *Id.* ¶ 17. The court explained:

> In the interests of brevity, the Court finds that the November 12 and November 17, 2020 UCC sales were commercially unreasonable because: (1) [CCO Condo]'s marketing process created confusion in the marketplace concerning the interests that were for sale; (2) [CCO Condo] required the winning bidder to acquire the collateral in one package, instead of allowing bidders to bid on the four property interests held as collateral individually or as a package that could potentially maximize the value of the collateral; and (3) [CCO Condo] required bidders to post an unreasonably high deposit to qualify to bid. Thus, it was not surprising that the prior scheduled UCC sales

> attracted no bidders for the property interests in the . . . four trophy Properties, thereby allowing [CCO Condo] to take control of the collateral by making a tax-efficient credit bid at the sale.

Pl.'s Trial Ex. 64 at 2. At the same time, the court declined HFZ Capital's request for a sixty- to ninety-day moratorium on any future UCC sale. *Id.* Instead, the court held that CCO Condo could notice another UCC sale "in accordance with this Decision and the terms of the Pledge and Security Agreements." *Id.* The terms of the Pledge and Security Agreements stated that "any foreclosure sale conducted in accordance with the following provisions shall be considered a commercially reasonable sale":

i. [CCO Condo] conducts the foreclosure sale in the State of New York;

ii. The foreclosure sale is conducted in accordance with the laws of the State of New York;

iii. Not more than thirty (30) days before, and not less than fifteen (15) days in advance of the foreclosure sale, [CCO Condo] notifies Pledgor at the address set forth herein of the time and place of such foreclosure sale;

iv. The foreclosure sale is conducted by an auctioneer licensed in the State of New York and is conducted in front of the New York Supreme Court located in New York City or such other New York State Court having jurisdiction over the Collateral on any Business Day between the hours of 9 a.m. and 5 p.m.;

v. The notice of the date, time and location of the foreclosure sale is published in the New York Times or Wall Street Journal (or such other newspaper widely circulated in New York, New York) for seven (7) consecutive days prior to the date of the foreclosure sale; and

vi. [CCO Condo] sends notification of the foreclosure sale to all secured parties identified as a result of a search of the UCC financings statements in the filing offices located in the State of Delaware conducted not later than twenty (20) days and not earlier than thirty (30) days before such notification date.

Pl.'s Trial Ex. 54 § 10(e); *see also CCO Condo*, 2022 WL 3867910, at *2.

On December 10, 2020, CIM Group noticed a new UCC sale to be held on January 7, 2021. ASOF ¶ 19. CIM Group notified Defendants of the sale the same day. *Id.* ¶ 20. Again, Newmark helped market and manage the sale. Pl.'s Trial Ex. 1 ¶ 35. On December 11, Newmark emailed a "teaser" advertising the sale to an investor list that included more than 31,000 contacts. *Id.* ¶ 36. The teaser's original language was modified—in response to the state court's ruling—to indicate that the interests for sale

3

were equity interests rather than loans. Tr. 35:17–25; *see also* Pl.'s Trial Ex. 71. The sale was then advertised in the *New York Times* for seven consecutive days from December 17, 2020, through December 23, 2020. ASOF ¶ 25. It was also advertised in the *New York Post* on December 22 and in the *New York Daily News* on December 22 and December 29. *Id.* ¶¶ 26–27. On December 29, Newmark sent a reminder to all potential bidders that bidders needed to register for the auction by January 5, 2021. Pl.'s Trial Ex. 1 ¶ 38. By January 6, 170 potential bidders had submitted the nondisclosure agreement required to access the data room. *Id.* ¶ 40. Of those 170 potential bidders, 97 had entered the data room and 88 had downloaded the due diligence materials. *Id.*

Unlike the original sale, the new sale was structured to allow bidders to bid on the four property interests individually or as a package. ASOF ¶ 30. The new sale also had different deposit requirements. The original sale had required a $1 million deposit for a party to qualify as a bidder and attend the sale. Pl.'s Trial Ex. 1 ¶ 44. But for the new sale, following the state court's conclusion that the $1 million figure was "unreasonably high," Pl.'s Trial Ex. 64 at 2, the deposit was cut in half to $500,000. Pl.'s Trial Ex. 1 ¶ 44. Furthermore, the original sale had required a $9 million deposit from the winning bidder. *Id.* ¶ 45. For the new sale, however, the winning bidder would be required to post a deposit of 5% of the winning bid, and the original $500,000 could be credited toward that amount. *Id.*; *see also* ASOF ¶¶ 31–33.

The sale went forward on January 7, 2021. ASOF ¶ 35.[1] It was conducted by Mannion Auctions, a New York-licensed auctioneer. Pl.'s Trial Ex. 1 ¶ 32. CCO Condo submitted the prevailing bid of $65 million for interests in all four properties. ASOF ¶¶ 35, 37. The proceeds, however, were inadequate to satisfy the loans Defendants had guaranteed to pay. *CCO Condo*, 2022 WL 3867910, at *2.

---

[1] On January 6, 2021, the day before the sale was held, all parties to the state court action agreed to a stipulation of discontinuance with prejudice. ASOF ¶ 34. The stipulation did not impair Defendants' ability to challenge the commercial reasonableness of any future sale. *CCO Condo*, 2022 WL 3867910, at *2.

4

### B. Procedural History

CCO Condo commenced this action on March 23, 2021. Doc. 1. It filed an amended complaint on April 22, 2021. Doc. 14. On October 22, 2021, CCO Condo moved for summary judgment to enforce the guaranties. Doc. 25. The parties did not dispute that Defendants had failed to meet their obligations as guarantors to repay the loans. *CCO Condo*, 2022 WL 3867910, at *2. Instead, their central disagreement was whether the sale of the properties was commercially reasonable. *Id.* On that question, the Court concluded that there were "material issues of fact which cannot be resolved at pre-discovery summary judgment." *Id.* at *8. The case thus proceeded to discovery, which closed on July 7, 2023. Doc. 40.

The parties submitted proposed findings of fact and conclusions of law on September 5 and September 6, 2023. Docs. 47, 49. On September 26, 2023, the Court held a bench trial to determine whether the sale was commercially reasonable. The lone witness was Daniel Ottensoser, the managing director of portfolio oversight at CIM Group. Tr. 17:14–16. Ottensoser's direct examination testimony was submitted in the form of an affidavit. Pl.'s Trial Ex. 1. He was cross examined at trial by counsel for Defendants.

## II.  LEGAL STANDARD

Under Article 9 of the New York UCC, "[e]very aspect of a disposition of collateral, including the method, manner, time, place, and other terms, must be commercially reasonable." N.Y. U.C.C. § 9-610(b). A disposition is commercially reasonable if it is made: "(1) in the usual manner on any recognized market; (2) at the price current in any recognized market at the time of the disposition; or (3) otherwise in conformity with reasonable commercial practices among dealers in the type of property that was the subject of the disposition." *Id.* § 9-627(b). The commercial reasonableness test analyzes "the totality of the circumstances, including the good faith efforts of the creditor." *Highland CDO Opportunity Master Fund, L.P. v. Citibank, N.A.*, No. 12 Civ.

5

2827 (NRB), 2016 WL 1267781, at *18 (S.D.N.Y. Mar. 30, 2016) (quoting *FDIC v. Wrapwell Corp.*, No. 93 Civ. 859 (CSH), 2002 WL 14365, at *9 (S.D.N.Y. Jan. 3, 2002)). In conducting this inquiry, courts consider "'accepted business practices' in the particular industry 'as a guide to what is most likely to protect both debtor and creditor.'" *Id.* (quoting *Bankers Tr. Co. v. J.V. Dowler & Co.*, 390 N.E.2d 766, 769 (N.Y. 1979)).

"The fact that a better price could have been obtained by a sale at a different time or in a different method from that selected by the secured party is not of itself sufficient to establish that the sale was not made in a commercially reasonable manner." *In re Sackman Mortg. Corp.*, 158 B.R. 926, 936 (Bankr. S.D.N.Y. 1993). "To prevail on a claim that a sale was commercially unreasonable, a plaintiff must allege not merely that the property's fair market value exceeded the sale price, but that it did so by an amount that 'shocks the court's conscience.'" *Liu v. Bank of Am.*, No. 08 Civ. 3358 (JG), 2010 WL 1702537, at *2 (E.D.N.Y. Apr. 28, 2010) (quoting *DeRosa v. Chase Manhattan Mortg. Corp.*, 782 N.Y.S.2d 5, 9 (App. Div. 2004)).

### III. DISCUSSION

Defendants argue that both the sale process and the ultimate price CCO Condo paid to acquire the properties at auction were commercially unreasonable. The Court disagrees. Viewed as a whole, the sale process was commercially reasonable. And Defendants have not offered any evidence demonstrating that the purchase price was low enough—relative to the fair market value of the properties—to shock the Court's conscience. Accordingly, judgment will be entered in favor of CCO Condo.

#### A. Sale Process

Defendants point to several different features of the UCC sale that rendered it commercially unreasonable. Doc. 49 at 10. They cite the timing and advertising of the sale during the winter holiday season and the COVID-19 pandemic, the size of the deposits required, a "leap frog" provision purportedly allowing CCO Condo to override the winning bid, and the lack of bidders at the sale. *Id.*

6

First, Defendants take issue with the timing of the sale. They argue that CCO Condo "hastily" issued the second notice of sale the day after the state court issued its order. *Id.* Defendants also emphasize that the sale was "formally advertised" for the first time on December 17, 2020—just eight days before Christmas and three weeks before the January 7 sale date. *Id.* And Defendants suggest that this timeframe was particularly improper due to the ongoing COVID-19 pandemic. *Id.*; *see also* Tr. 4:3–12 (counsel for Defendants asserting that it was "patently commercially unreasonable" for CCO Condo to set a deadline for bidders to register "25 days after being told the sale was commercially unreasonable, through Christmas, through Hannukah, through the New Year season, and in the middle of COVID").

These arguments are not persuasive. The state court decision specifically rejected Defendants' proposed sixty- to ninety-day moratorium on any future UCC sale. Pl.'s Trial Ex. 64 at 2. Such a restriction, the court explained, would be "inconsistent with the terms of the Pledge and Security Agreements, which specifically define the timetable for a commercially reasonable UCC sale." *Id.* The court said that CCO Condo could "notice a UCC sale in accordance with this Decision and the terms of the Pledge and Security Agreements." *Id.*; *see also id.* at 2–3 (explaining that CCO Condo could "proceed *forthwith* with a *de novo* UCC sale in accordance with this Decision and the Pledge and Security Agreements" (first emphasis added)). Under the terms of the Pledge and Security Agreements, CCO Condo was required to notify Defendants of the time and place of the sale between fifteen to thirty days in advance. Pl.'s Trial Ex. 54, § 10(e)(iii). CCO Condo complied with that requirement by notifying Defendants of the sale on December 10, 2020—twenty-eight days before it was scheduled to take place. ASOF ¶ 22.

Defendants repeatedly suggest that the sale should have been delayed. *See, e.g.*, Doc. 49 at 10 ("Instead of digesting the State Court Order's admonishment of its tactics, . . . [CCO Condo] hastily issued a second notice of sale and Terms."); Tr. 14:13–

7

17 (counsel for Defendants asserting that "[o]ne would think you would step back, take a breather, talk to your expert who guided you to a commercially unreasonable sale in the first place, and maybe take a breather and give it . . . time for the market to catch up"). As another court in this District has explained, however, "[a] secured creditor is under no obligation to delay the sale of collateral, especially collateral that is declining in value, in the hope of obtaining a higher price unless the timing of the sale renders it commercially unreasonable." *SNCB Corp. Fin. Ltd. v. Schuster*, 877 F. Supp. 820, 828 (S.D.N.Y. 1994); *see also Atlas MF Mezzanine Borrower LLC v. Macquarie Tex. Loan Holder LLC*, 158 N.Y.S.3d 19, 21 (App. Div. 2021) (concluding that period of under two months between default and auction "was not insufficient as a matter of law"). Ottensoser credibly testified that there were legitimate reasons to proceed promptly with the sale. *See, e.g.*, Tr. 40:17–21 ("The best way to . . . maximize value here was to proceed with pace so that we can get somebody who was actually focused on the assets doing the work that was needed to start selling units to pay down the debt in front of us."); Tr. 59:21–24 ("We wanted to get to someone to get to these assets so that we could get the highest value for these properties. Every day we waited, the value of these assets was diminishing."). And Defendants have not identified any case law indicating that a twenty-eight-day window between the time of notice to Defendants and the time of auction is commercially unreasonable.

Additionally, the Court finds that the marketing efforts undertaken here were reasonable. CCO Condo met and exceeded the terms set forth in the Pledge and Security Agreements, which required the sale to be advertised in a widely circulated New York newspaper—such as the *New York Times* or the *Wall Street Journal*—for seven consecutive days prior to the sale. Pl.'s Trial Ex. 54, § 10(e)(v). As noted above, the sale was advertised in the *New York Times* from December 17 through December 23, 2020. ASOF ¶ 25. It was also advertised in two issues of the *New York Daily News* and one issue of the *New York Post*. *Id.* ¶¶ 26–27. In addition to those advertisements, Newmark

sent a teaser to an investor list of more than 31,000 contacts. Pl.'s Trial Ex. 1 ¶ 36. By January 6, 2021, those efforts had resulted in 170 potential bidders signing the nondisclosure agreement required to access the data room, with 97 of those potential bidders entering the data room and 88 of them downloading the due diligence materials. *Id.* ¶ 40. Ottensoser testified that the latter group included "all the sophisticated buyers you would expect to participate in an auction of this kind—Goldman Sachs, KKR, Apollo—they would have downloaded all of this information." Tr. 29:15–18; *see also* Tr. 31:25–32:2 ("If you look at the people who downloaded the information, it was all the people we would expect or would want to participate in an auction of this sophistication."). This level of outreach is consistent with marketing efforts that other courts have deemed commercially reasonable. *See Orix Credit All., Inc. v. Blevins*, No. 90 Civ. 5759 (SS), 1993 WL 177940, at *2 (S.D.N.Y. May 17, 1993) (finding that sale was commercially reasonable as a matter of law where "defendants received proper notice of the sale; the sale was advertised twice in a newspaper of general circulation in the location where the sale was conducted as well as in a newspaper of general circulation where the defendants live; and the sale notice set out the day, time and place as well as the collateral and terms of the sale"); *see also Wickapogue 1 LLC v. Blue Castle (Cayman) Ltd.*, 657 F. Supp. 3d 234, 241 (E.D.N.Y. 2023) (finding at preliminary injunction stage that sale was commercially reasonable where information was sent to 39,000 investors and was published in newspapers including the *Wall Street Journal*); *Atlas MF Mezzanine Borrower, LLC v. Macquarie Tex. Loan Holder, LLC*, No. 17 Civ. 1138 (LLS), 2017 WL 729128, at *4 (S.D.N.Y. Feb. 23, 2017) (finding at preliminary injunction stage that sale was commercially reasonable where information was sent to thousands of investors and 189 documents were made available in online data room more than six weeks before sale).

The fact that the sale took place around the winter holiday season does not render it commercially unreasonable. A New York trial court rejected a similar argument in

*Lincoln Street Mezz II, LLC v. One Lincoln Mezz 2 LLC*, No. 530492/2021, 2021 WL 5824535 (N.Y. Sup. Ct. Dec. 8, 2021). In that case, the plaintiff sought to enjoin a foreclosure sale that was scheduled for December 20. *Id.* at *1–2. In denying an injunction, the court observed that the notices of the sale were publicized on November 11, "well before any holiday season." *Id.* at *3. The court continued:

> The mere fact the actual sale is a few days before a holiday and might interfere with an overarching and extended holiday season does not mean the sale is commercially unreasonable as a matter of law. . . . To argue otherwise would virtually eliminate most of the year as appropriate for scheduling a sale, after all, holidays and vacations are always approaching and can interfere with a steady and uninterrupted work flow.

*Id.* In the few cases where notice dates have been found unreasonable, the court explained, "the dates were literally within a day or two of a holiday, objectively commercially unreasonable dates." *Id.* Here, the sale was noticed on December 10, 2020, advertised throughout the second half of December, and conducted on January 7, 2021. These circumstances are not analogous to cases where the relevant dates were "literally within a day or two of a holiday." *Id.* And as in *Lincoln Street*, "the agreement between the parties does not dictate certain periods of time where the scheduling of any [foreclosure] sale may not occur." *Id.*

Nor is the sale commercially unreasonable because it took place during the COVID-19 pandemic. In another New York decision, a trial court noted that a pandemic-related executive order barring the initiation of certain proceedings "does not include UCC sales which are not judicial proceedings." *893 4th Ave. Lofts LLC & Michael Uhr v. 5Aif Nutmeg, LLC*, No. 511942/20, 2020 WL 4936913, at *2 (N.Y. Sup. Ct. Aug. 25, 2020). As a result, there was no basis to stay the UCC sales at issue. *Id.*; *see also WWML96 DE Mezz, LLC v. Series 2020A of Nahla Cap., LLC*, No. 656721/2020, 2021 WL 4815627, at *1 (N.Y. Sup. Ct. Oct. 12, 2021) (holding that "[t]he pandemic does not inherently create a question of fact" and that "plaintiff does not cogently explain why the

ordinary bid and sale terms, manner of notice, or the 63-day notice period were unreasonable, even during the pandemic"). Here too, Defendants fail to persuasively explain how the pandemic rendered the terms of the sale commercially unreasonable. As Ottensoser explained, the state court expressly rejected the argument that a sixty- to ninety-day moratorium was required before CCO Condo could conduct another sale. Tr. 79:14–15; *see* Pl.'s Trial Ex. 64 at 2. And he testified that time was of the essence in determining when to hold the sale. *See, e.g.*, Tr. 79:15–17 ("[T]he asset was wasting, and so therefore getting resolution to it, to maintain [the] value of these assets was important."). In these circumstances, the timing of the sale was not commercially unreasonable.

      Defendants' other objections to the sale process fare no better. They assert that the opening deposit of $500,000 and the second deposit of 5% of the purchase price were both excessive. Doc. 49 at 10. While the state court found that the original $1 million deposit was too high, CCO Condo cut that figure in half for the January 7 sale. ASOF ¶ 31; Pl.'s Trial Ex. 1 ¶ 44. And rather than mandating a second deposit of $9 million from the prevailing bidder, CCO Condo required a second deposit of 5% of the winning bid. ASOF ¶ 32; Pl.'s Trial Ex. 1 ¶ 45. CCO Condo also allowed the $500,000 opening deposit to be credited toward the second deposit. ASOF ¶ 33.

      Requiring a deposit does not render a sale commercially unreasonable. In *Atlas*, the sale terms "required that the 'selected bidder' make a deposit by certified or bank check '[a]t' the auction." 158 N.Y.S.3d at 22 (alteration in original). The Appellate Division found that the secured party's conduct "appears to have been appropriately calculated to ensure that plaintiff had the financial ability to close." *Id.* And the court concluded that it was not commercially unreasonable for the secured party "to select a bidder that had a deposit check in-hand over one that did not." *Id.* In this case, likewise, it was reasonable for CCO Condo to require deposits to ensure that interested parties could fulfill the conditions of closing. *See also Wickapogue*, 657 F. Supp. 3d at 241

11

(finding at preliminary injunction stage that it was commercially reasonable to require bidders to submit 10% of their maximum bid prior to the sale because "[s]uch requirements incentivize bidders with legitimate interests to participate, and can be used as a method to diligence the *bona fides* of potential bidders"). Furthermore, Ottensoser stated that, to his recollection, neither Defendants nor any potential bidder objected to the deposit amount. Pl.'s Trial Ex. 1 ¶ 44. The Court finds that the reduced opening deposit and second deposit were not unreasonable.

Next, Defendants point to a "leap frog" provision in section 12 of the terms of sale. Doc. 49 at 10. According to Defendants, this provision "gave [CCO Condo] the unilateral right to 'leap frog' any bidder and drive them away from being interested." *Id.* at 4. But that is not an accurate characterization of the provision. The terms state that the "Secured Party"—CCO Condo—may "designate as the back-up bidder the Qualified Bidder, which may be the Secured Party, making the next highest bid for the Collateral." Pl.'s Trial Ex. 65, Ex. A § 12. If the prevailing bidder failed to timely pay the second deposit or the purchase price, the back-up bidder would be obligated to execute a confirmation of sale and pay the second deposit. *Id.* Under this provision, in other words, "CCO Condo could only designate itself as the back-up bidder and could not in fact 'leap frog' the winning bid." *CCO Condo*, 2022 WL 3867910, at *2 n.2. That is consistent with Ottensoser's testimony on redirect examination:

> Q. . . . And what does it say the secured party can do at the auction?
>
> A. We can designate the next highest qualified bidder to be backup bidder to the selected bidder.
>
> Q. So if someone else had shown up at the auction and bid—your opening bid was $65 million, correct?
>
> A. Yes.
>
> Q. If someone had shown up at the auction and bid $66 million, what does this mean that you could do?
>
> A. Well, if someone bid $66 million, they would be the selected bidder, and we can choose another party to be the backup bidder to

> the selected bidder if the selected bidder doesn't satisfy the closing conditions.

Tr. 117:2–14. The inclusion of this provision allowing CCO Condo to designate a back-up bidder does not make the sale process commercially unreasonable.

Finally, Defendants contend that the sale was unreasonable because CCO Condo knew that its terms had not attracted any bidders by January 7. Doc. 49 at 10. Other courts have explained, however, that "a lack of bidders is not necessarily the result of a commercially unreasonable sale." *In re Sackman*, 158 B.R. at 936; *see also, e.g.*, *Leasing Serv. Corp. v. Yawn*, 697 F. Supp. 789, 793 (S.D.N.Y. 1988) ("That plaintiff was the sole bidder and ultimate purchaser does not of itself invalidate the sale as unreasonable."); *Int'l Paper Credit Corp. v. Columbia Wax Prods. Co.*, 434 N.Y.S.2d 270, 271 (App. Div. 1980) ("[T]he paucity of bidders at the auction and the low sale price for which the machinery had been sold was not the result of a commercially unreasonable sale, but reflective of the lack of demand for the product."). Here too, the fact that CCO Condo was the sole bidder does not invalidate the sale.

### B.  Sale Price

Defendants also argue that the price paid by CCO Condo for the properties was unreasonable. Doc. 49 at 11. CCO Condo prevailed at the auction with a credit bid of $65 million. ASOF ¶ 35.

In cases where a deficiency is calculated under N.Y. U.C.C. § 9-615(f), "the debtor or obligor has the burden of establishing that the amount of proceeds of the disposition is significantly below the range of prices that a complying disposition to a person other than the secured party . . . would have brought." N.Y. U.C.C. § 9-626(a)(5). "Courts have consistently declined to disturb a foreclosure sale upon a challenge to amount recovered for the collateral, except in the narrow circumstance where the price alone is so inadequate as to shock the court's conscience." *DeRosa*, 782 N.Y.S.2d at 9; *accord, e.g.*, *Liu*, 2010 WL 1702537, at *2.

In this case, Ottensoser asserted that the $65 million bid "was in line with the market's valuation of the Properties at the time, which was during the COVID-19 pandemic and before vaccines were widely available, with New York real estate facing a serious threat."  Pl.'s Trial Ex. 1 ¶ 57.  Defendants have not offered any evidence of their own to show that the fair market value of the properties was dramatically higher than the sale price.  As a result, the Court cannot conclude that the price was so unreasonable as to shock the conscience.  *See Orix Fin. Servs., Inc. v. Thunder Ridge Energy, Inc.*, No. 01 Civ. 4788 (RJH) (HBP), 2006 WL 587483, at *16 (S.D.N.Y. Mar. 8, 2006) (noting that guarantors had "provided no admissible evidence establishing that the sales price was in fact unreasonably low"); *see also First City Div. of Chase Lincoln First Bank, N.A. v. Vitale*, 510 N.Y.S.2d 766, 769–70 (App. Div. 1987) (where plaintiff submitted affidavits indicating that the prices received represented the fair market value of the property sold, and defendants' opposing papers did not include any evidence that the prices received deviated from the fair market value, court concluded that "the absence of a presale appraisal is insufficient alone to raise any triable issue on commercial reasonableness").

In addition, Ottensoser identified other potential factors that may have contributed to deflation of the properties' value.  Those factors included significant construction work still to be completed, Pl.'s Trial Ex. 1 ¶¶ 59–61, pending lawsuits related to one of the properties, *id.* ¶¶ 62–65, and internal issues involving HFZ Capital that were public before the January 7 sale, *id.* ¶¶ 66–68.  This testimony lends additional support to the Court's conclusion that the sale price was not low enough to shock the conscience.  *See SNCB Corp. Fin. Ltd. v. Schuster*, 877 F. Supp. 820, 828 (S.D.N.Y. 1994) (finding no genuine issue of fact regarding commercial reasonableness of sale where plaintiff had "submitted evidence explaining why potential purchasers might have been reluctant to bid," while defendants failed to submit any non-speculative evidence "to substantiate their claim that the price obtained was inadequate").

### IV. CONCLUSION

For the foregoing reasons, considering the entire process as a whole, the Court concludes that the January 7 sale was commercially reasonable. CCO Condo is entitled to the following damages from Defendants: $86,350,220.27 for the amounts due under the guaranties and for attorney fees and costs incurred through summary judgment, *see CCO Condo*, 2022 WL 3867910, at *6, as well as $732,858.40 for attorney fees and costs incurred since summary judgment, *see* Doc. 47 ¶ 240. CCO Condo is also entitled to prejudgment interest at the rate of 9% on only the amounts due under the guaranties ($86,042,036.29) from April 22, 2021, until the date judgment is entered. *See* Pl.'s Trial Ex. 1 ¶ 69 & n.6.

The Clerk of Court is respectfully directed to enter judgment in favor of CCO Condo in the amount of $87,083,078.67, plus prejudgment interest at the rate of 9% on only the amounts due under the guaranties ($86,042,036.29) from April 22, 2021, until the date judgment is entered, and to close the case.

It is SO ORDERED.

Dated:   February 14, 2024
         New York, New York

_____
EDGARDO RAMOS, U.S.D.J.